Anthony W. Trujillo, State Bar # 248860
    Email: at@tru-win.com
6080 Center Drive #600
Los Angeles, CA 90045
Telephone:  310.210.9302
Facsimile:   310.921.5616

Attorneys for Plaintiff DANIEL COFFEY
and the Putative Class

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

### (LOS ANGELES)

| | |
|---|---|
| DANIEL COFFEY, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>          vs.<br><br>CHEVRON U.S.A. INC.; CHEVRON CORPORATION; and DOES 1–10<br><br>          Defendants, | CASE NO.: 2:25-cv-009699<br><br>**CLASS ACTION COMPLAINT FOR:**<br>   1) **Negligence;**<br>   2) **Strict Liability (Abnormally Dangerous**<br>   3) **Nuisance;**<br>   4) **Trespass;**<br>   5) **Negligence Per Se;**<br>   6) **Equitable Relief - Medical Monitoring; and**<br>   7) **Equitable Relief - Restitution / Unjust Enrichment**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**(CLASS ACTION)** |

**CLASS ACTION COMPLAINT**

1.    Plaintiff Daniel Coffey ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows:

**INTRODUCTION**

2.    This action arises from a preventable industrial catastrophe that caused extensive damage throughout Los Angeles County's South Bay. On the evening of October 2, 2025, a massive explosion tore through the Chevron El Segundo Refinery, sending fireballs hundreds of feet into the air and blanketing nearby communities with toxic soot and chemical fallout. *The blast was not a freak accident. It was the foreseeable result of years of deferred maintenance, ignored warnings, and repeated safety violations at one of California's oldest and most heavily cited refineries*. In pursuit of profit and production, Chevron chose to gamble with public safety—and Los Angeles County residents like Plaintiff lost. The result was a community left coughing, cleaning, and fearing for its health and property. Plaintiff brings this class action to hold Chevron accountable for operating a refinery that endangered thousands of Los Angeles County residents, contaminated homes and businesses, and violated the most basic duties owed to the public it surrounds.

**JURISDICTION AND VENUE**

3.    This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed class contains at least 100 members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and minimal diversity exists because at least one class member (including Plaintiff, a California citizen) is a citizen of a state different from at least one defendant (including Chevron U.S.A. Inc., incorporated in Pennsylvania and Defendant Chevron Corporation is incorporated in Delaware).

4.      Defendants purposefully direct substantial refining and commercial activities in California and in this District; the claims arise from Defendants' conduct and the October 2, 2025, refinery explosion in El Segundo. Although Chevron U.S.A. Inc. maintains significant operations in California, it is incorporated in Pennsylvania and therefore a citizen of that state under 28 U.S.C. § 1332(c). Likewise, Chevron Corporation is incorporated in Delaware. These out-of-state corporate citizenships establish minimal diversity under the Class Action Fairness Act and demonstrate that this action is not a purely local controversy within the meaning of § 1332(d)(4).

5.      Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the El Segundo incident and resulting injuries to residents of Los Angeles County (including Redondo Beach).

6.      Assignment to the Western Division (Los Angeles) is proper based on the county of occurrence/residence, consistent with the civil cover sheet (CV 71) venue instructions for Los Angeles County.

## **PARTIES**

7.      Plaintiff Daniel Coffey is an adult individual domiciled in Redondo Beach, California. After the Incident, he experienced respiratory symptoms (coughing, wheezing, chest tightness, headaches), sought or will seek medical care and relief, and incurred property damage to his car and boat from soot/ash/oily fallout.

8.      Defendant Chevron U.S.A. Inc. ("Chevron" or "Defendant") is a Pennsylvania corporation that owns and/or operates the Chevron Refinery in Los Angeles County, California. Chevron managed the processes and equipment implicated in the Incident and is responsible for releases and emissions therefrom.

9.      Defendant Chevron Corporation is a Delaware corporation with substantial, continuous, and systematic contacts with California and, at all relevant times, exercised ownership, oversight, control, and/or management with respect to

CLASS ACTION COMPLAINT

refining subsidiaries and operations at the Chevron's El Segundo Refinery (sometimes referred to herein as the "Refinery" or the "Chevron Refinery").

10.     DOE Defendants 1–10 are entities or individuals responsible, in whole or part, for the design, operation, maintenance, inspection, safety management, emergency response, and/or emissions monitoring at the refinery and whose identities are presently unknown. Plaintiff will amend to identify them when ascertained

11.     At all times herein mentioned, Defendants, and each of them, were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency. Each defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-defendant, and/or retained the benefits of said wrongful acts.

12.     Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs and the class, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each Defendant acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongdoings alleged herein.

13.     Defendants reached an agreement to perform the acts complained of herein; all were direct, necessary, and substantial participants in the conspiracy, common enterprise, and ordinary course of conduct complained of herein; and each was aware of its overall contribution to and furtherance of the conspiracy, common enterprise, and common course of conduct. Defendants' acts of conspiracy include, inter alia, all of the acts that each of them is alleged to have committed in furtherance of the wrongful scheme complained of herein, except those relating to the reaching of agreements or understandings sufficient to characterize their conduct as conspiratorial.

CLASS ACTION COMPLAINT

**FACTS**

14.    On the evening of October 2, 2025, at approximately 9:30 p.m., a massive explosion erupted at the Chevron Refinery in Los Angeles County. On information and belief, the blast originated in the refinery's Isomax Unit 7, a hydrocracking process unit that converts heavy gas oil into jet fuel. Witnesses reported seeing a fireball and flames shooting hundreds of feet into the air, turning the night sky over the South Bay a neon orange. The explosion generated a powerful shockwave that caused windows to rattle and buildings to tremble across Manhattan Beach, Redondo Beach, and other nearby communities.

15.    The fire was not under control until the next day, October 3, 2025. Chevron initially reported that all employees and contractors were accounted for and that no injuries had been confirmed. It was later revealed, however, that at least one worker was alleged to have sustained injuries and subsequently filed a lawsuit.

16.    The nearby residents were advised to stay indoors with windows closed while the blaze burned. Manhattan Beach, located directly downwind of the refinery, issued a precautionary shelter-in-place order that lasted until about 2:00 a.m. on October 3, 2025.

17.    On information and belief, the explosion occurred in a key processing area of the refinery, prompting Chevron to shut down multiple units as a safety measure. In addition to the burning Isomax hydrocracker, the company idled a 60,000-barrel-per-day catalytic reformer, a 45,000-barrel-per-day secondary hydrocracker, and a 73,000-barrel-per-day fluid catalytic cracker. The Chevron Refinery has a total capacity of approximately 285,000 barrels per day. Chevron stated it would restart the affected units as soon as safely possible, and within days began quickly bringing them back online.

18.    The exact cause of the explosion remains under investigation. Chevron and the California Division of Occupational Safety and Health (Cal/OSHA) began inspecting the Isomax Unit on October 3, 2025, to determine what equipment or

CLASS ACTION COMPLAINT

operational failure had triggered the blast. Chevron has withheld from disclosing a definitive cause, and investigators were still examining turbine components and safety systems as of mid-October. The U.S. Chemical Safety Board, which typically handles such incidents, was furloughed due to a federal budget impasse, leaving state and local regulators to lead the inquiry.

19.     Within days of the incident, reports surfaced suggesting the disaster might have been preventable. Shortly thereafter, a personal injury lawsuit was filed on behalf of a Refinery employee who claimed to have been injured while escaping the blast. The complaint alleged that he suffered severe physical and emotional injuries while running from the explosion. His attorneys characterized the fire as *a preventable disaster caused by Chevron's disregard for safety* procedures and its cost-cutting at the expense of worker protection. These allegations, while unproven, suggest that systemic error may have contributed to the explosion. Plaintiffs are informed and believe that any root-cause analysis of the Isomax failure will reveal equipment or process deficiencies that Chevron knew or should have known about.

20.     Chevron's compliance history at the Chevron Refinery reflects a pattern of safety and environmental violations. In the five years leading to the explosion, the facility received *forty-six notices of violation* from regulatory agencies, *thirteen of them in the preceding year alone*.

21.     On September 22, 2025—less than two weeks before the fire—the South Coast Air Quality Management District cited Chevron for a major chemical leak and for failing to maintain equipment in proper working condition.

22.     In August 2025, Chevron acknowledged to regulators that dangerous deposits had built up in furnace tubes, creating a risk of overheating. *Federal OSHA records show at least seventeen safety citations over the past decade*, including violations involving hazard analysis and workplace safety procedures. Plaintiffs are informed and believe that this long history of infractions evidences Chevron's ongoing negligence and disregard in maintaining the refinery's aging infrastructure.

CLASS ACTION COMPLAINT

23.    The October 2025 fire was not an isolated event. Over the past decade, the El Segundo facility has experienced several significant fires and malfunctions, including *major incidents in 2016, 2017, 2018, and 2022*. On information and belief, safety advocates have long warned that repeated accidents of this kind indicate systemic problems within Chevron's operations and oversight. Chevron's history of deferring maintenance has been noted before; for example, in 2012, a corroded crude oil pipe at the company's Richmond refinery ruptured, causing a massive fire and toxic plume that sent more than fifteen thousand Bay Area residents to hospitals. Investigators determined that Chevron had known about the corrosion but delayed replacing the pipe. Plaintiffs are informed and believe that these prior disasters demonstrate a pattern of negligence and disregard for safety that contributed to the Chevron Refinery explosion.

24.    The fire emitted thick black smoke and combustion byproducts into the air, raising immediate concerns about air quality. Chevron has been telling the public that fenceline monitors reported no regulatory exceedances, but fails to explain the meaning. On information and belief, when Chevron or regulators say "no regulatory exceedances," it really means our fixed air monitors didn't record concentrations above the numeric limits defined in their permits or Rule 1180 during the averaging periods we use. It does not mean: "No one was exposed to harmful substances" or "the air was completely safe."

25.    Regional air-quality monitors detected elevated pollutant levels downwind, particularly for volatile organic compounds that spiked to about 300 parts per billion near the refinery fence. Officials noted that this concentration. The most visible pollutant was soot—particulate matter lifted high into the atmosphere by the heat of the fire. The winds carried the smoke throughout Los Angeles County's South Bay area during the night, and the following morning, winds brought smoke and odors to the marina, more than six miles south of the Chevron Refinery.

CLASS ACTION COMPLAINT

26.     On information and belief, the pollution caused by Chevron could have traveled as far as 10 miles from the Chevron Refinery following the explosion at the Refinery, covering all of El Segundo, Manhattan Beach, and Hermosa Beach. Even Residents of Redondo Beach, including but not limited to the Plaintiff, have reported oily soot and ash settling on cars, boats, and other property. Samples from boats and vehicles parked in the marina located in Redondo Beach, six miles south of the Chevron Refinery, were damaged by the flying residue. Laboratory analysis of such residue is expected to reveal hydrocarbon oils and combustion byproducts. Experts have warned that refinery soot is corrosive and can damage metal, glass, and fabric surfaces if not promptly cleaned. Some residents undertook cleanup efforts at their own expense, hiring professionals to remove residue from their property.

27.     Health agencies issued public advisories instructing residents to stay indoors if they saw or smelled smoke and to avoid using leaf blowers or ordinary vacuums to clean up ash, since those could re-suspend fine particulates. Officials instead recommended damp-wiping surfaces and using HEPA-filter vacuums. Medical experts warned that refinery smoke and particulate matter can inflame the respiratory system and cause coughing, eye irritation, headaches, and nausea, particularly in individuals with asthma or other respiratory or heart conditions.

28.     Some residents, like Plaintiff, reported acute health symptoms in the aftermath. On information and belief, emergency rooms noted an uptick in respiratory complaints, including at least one severe asthma attack in Hawthorne, attributed to smoke exposure. Others experienced headaches, throat irritation, and fatigue for days afterward. Although no long-term injuries have yet been confirmed, many residents remain concerned about potential lingering effects, given the lack of information about what was dispersed upon them by the Chevron Refinery.

29.     Chevron dispatched what it called its "Health, Safety, and Environment team" to conduct mobile air monitoring, and claimed that no dangerous concentrations were detected. Experts, however, have explained that the measurements may not

CLASS ACTION COMPLAINT

capture short-term exposure spikes or highly localized plumes. Plaintiffs are informed and believe that toxic materials may have risen above the monitor height and descended further downwind, escaping detection but still affecting the community.

30.     Residue deposited on surfaces poses additional hazards. Soot and ash from refinery fires often contain heavy metals such as vanadium, nickel, and iron, as well as carcinogenic polycyclic aromatic hydrocarbons. These substances can adhere to cars, soil, and fabrics, creating risks through skin contact or accidental ingestion. Environmental groups have also warned that oil and particulates washed into coastal waters may threaten marine life. Plaintiffs allege that all settled pollutants on land or in nearby waters should be considered potentially hazardous.

31.     Dense residential and commercial areas surround the El Segundo refinery. Within a mile of the plant are thousands of homes, schools, and businesses in El Segundo and Manhattan Beach, with Redondo Beach and Hawthorne only slightly farther away. Tens of thousands of people live or work within the probable fallout zone. Plaintiffs are informed and believe that hundreds of households and businesses suffered property damage, health impacts, or both as a result of the October 2 fire.

32.     The explosion profoundly affected the community's sense of safety. Videos of the towering fireball spread rapidly online, with viewers describing it as "like we got nuked." Residents recounted fear and confusion as the sky glowed orange and sirens wailed. By morning, many expressed anger and anxiety over possible exposure to toxins. Public meetings and local media reflected widespread mistrust toward Chevron, with residents demanding full disclosure and accountability.

33.     Public officials sought to calm the community while emphasizing the need for investigation. Los Angeles Mayor Karen Bass assured the public that operations at Los Angeles International Airport were unaffected and that authorities were closely monitoring the situation. El Segundo's mayor praised first responders, while Congresswoman Maxine Waters publicly urged Chevron to accept responsibility for any harm caused. Several South Bay city councils held meetings pressing Chevron for

CLASS ACTION COMPLAINT

answers, and state regulators, including the California EPA and the Attorney General's office, pledged close oversight and possible enforcement actions. Environmental groups such as the Center for Biological Diversity and Food & Water Watch cited the fire as evidence that recent regulatory rollbacks had made such incidents more likely and called for stricter oversight and transparency.

34.    It is becoming clearer that the incident also had tangible economic consequences. Wholesale fuel prices rose, and retail gasoline prices for Residents like Plaintiff climbed slightly. Locally, residents and businesses incurred direct costs from soot cleanup and temporary closures. Restaurants and shops near the refinery reported lost business during and after the fire due to public concern and restricted access.

35.    On or about October 4, 2025, an injured refinery worker filed suit alleging Chevron's failure to follow safety procedures and its misrepresentation that no injuries had occurred.

36.    Government agencies also launched formal investigations. Cal/OSHA began examining maintenance and training records to determine whether Chevron had violated state safety regulations. The South Coast Air Quality Management District initiated a review under its Rule 1180 plan, ordering Chevron to produce a detailed incident report within thirty days. State and local officials are committed to coordinating their efforts and holding Chevron accountable.

37.    Chevron's public statements about the fire were brief, confirming only that the blaze was contained and that no injuries were initially reported. Plaintiffs are informed and believe that these statements downplayed the extent of the fallout and omitted key facts about pollutants released into surrounding neighborhoods. Public officials have since demanded greater transparency and accountability, and regulators have warned that violations of environmental laws could result in enforcement actions.

38.    To date, Chevron has not established any voluntary compensation fund for affected residents. Plaintiffs are informed and believe that individuals have claims for cleaning costs, medical expenses, and other losses. At this point, Chevron has not

CLASS ACTION COMPLAINT

offered to provide compensation for property contamination, cleanup expenses, medical treatment, or emotional distress.  On information and belief, no direct reimbursement mechanism currently exists apart from these legal actions.

39.  In sum, the October 2, 2025, explosion and fire at Chevron's Refinery released a plume of pollutants that spread across the South Bay, exposing thousands of residents to volatile hydrocarbons, soot, and oily residue. Plaintiffs and similarly situated residents experienced health effects, incurred expenses to decontaminate property, and suffered emotional distress arising from the incident. Each of these injuries was caused by Chevron's negligent and unsafe operation of the refinery.

40.  Plaintiffs allege, on information and belief, that the foregoing facts demonstrate Chevron's failure to maintain safe and lawful operations in violation of applicable safety and environmental regulations. As a direct and proximate result, Plaintiffs and class members have sustained property damage, economic losses, medical expenses, and emotional harm. These factual allegations form the foundation for the causes of action asserted below, which are incorporated herein by reference.

## **CLASS ACTION ALLEGATIONS**

41.  Rule 23 Bases (L.R. 23-2.1). Plaintiff brings this action under Fed. R. Civ. P. 23(a) and 23(b)(3) for damages and under Rule 23(b)(2) for injunctive/abatement and medical-monitoring relief.

42.  Class Definition (L.R. 23-2.2(a)). Damages Class (Rule 23(b)(3)): All persons who, between October 2–9, 2025, resided, owned, or occupied property within up to ten (10) miles of the Chevron Refinery and who suffered personal injury (including respiratory symptoms) and/or property contamination, loss of use/enjoyment, or economic loss caused by the October 2, 2025 explosion/fire and resulting emissions.

CLASS ACTION COMPLAINT

43.     Injunctive/Monitoring Class (Rule 23(b)(2)): All persons within the exposure footprint identified by plume dispersion and particulate deposition analyses for the October 2, 2025, incident, for purposes of abatement, enhanced monitoring, and medical-monitoring program relief. (Class boundaries may be refined after discovery and expert analysis.)

44.     Size (L.R. 23-2.2(b)). The class numbers in the thousands across multiple South Bay communities; joinder is impracticable.

45.     Adequacy (L.R. 23-2.2(c)). Plaintiff will fairly and adequately protect class interests, has no conflicts, and has retained experienced class counsel.

46.     Commonality (L.R. 23-2.2(d)). Common issues include whether Defendants' conduct caused the explosion/fire; whether emissions migrated off-site; whether such conduct constitutes negligence, strict liability (abnormally dangerous activity), nuisance, trespass, and negligence per se; and whether class-wide remedies (abatement, monitoring, damages) are warranted.

47.     Typicality (L.R. 23-2.2(e)). Plaintiff's claims are typical—arising from the same event, mechanisms of exposure, and legal theories.

48.     Predominance & Superiority (L.R. 23-2.2(f)). Liability and general causation are provable with common evidence (refinery process failures, plume/meteorology, community-wide exposures), and a class action is superior to thousands of individual suits.

49.     Notice (L.R. 23-2.2(g)). If a Rule 23(b)(3) damages class is certified, Plaintiff proposes direct notice to last-known addresses (e.g., tax rolls/utility records) and appropriate publication/digital notice; for Rule 23(b)(2) relief, class notice will follow the Court's direction.

///

///

CLASS ACTION COMPLAINT

1

## FIRST CLAIM FOR RELIEF

2

## NEGLIGENCE

3

### [Against All Defendants]

4       50.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

5       51.    Plaintiffs assert this claim against all Defendants, including Chevron

6   Corporation and each person or entity responsible for the ownership, operation,

7   inspection, maintenance, and safety management of the Chevron El Segundo Refinery.

8       52.    Defendants owed Plaintiffs and the proposed Class a duty to exercise

9   ordinary, and under the circumstances, utmost care in operating, maintaining,

10  inspecting, and supervising a high-hazard petroleum refinery situated within a densely

11  populated coastal corridor of Los Angeles County. California law imposes a general

12  duty of reasonable care to avoid foreseeable harm to neighboring persons and property,

13  as reflected in Civil Code section 1714. Refinery operators are further bound by

14  specific statutory and regulatory obligations, including the California Health and

15  Safety Code sections 25500 et seq. governing hazardous materials release response,

16  Cal/OSHA Process Safety Management Standards (8 Cal. Code Regs. § 5189), and the

17  South Coast Air Quality Management District's Rule 1180, which requires continuous

18  fenceline air monitoring. These duties are heightened in the context of an inherently

19  dangerous industrial activity such as refining jet fuel under extreme temperature and

20  pressure, which presents known and foreseeable risks of explosion, toxic emissions,

21  and environmental contamination.

22      53.    On information and belief, Defendants breached their duties in numerous

23  ways. They failed to properly inspect, maintain, and replace corroded or degraded

24  piping and pressure vessels within the Isomax hydrocracking unit, despite repeated

25  regulatory citations and internal warnings. They allowed unsafe operating conditions

26  to persist in violation of Cal/OSHA process-safety standards and SCAQMD air-

27  emission limits. They ignored or deferred essential maintenance even after receiving

28  forty-six regulatory violations in five years, including thirteen in the year preceding the

incident and a September 22, 2025, notice for failure to keep equipment in proper working condition. Chevron further sought leniency from regulators despite acknowledging dangerous furnace-tube buildup that risked overheating equipment, demonstrating knowledge of latent hazards. Defendants failed to implement and enforce adequate leak-detection, flare-management, and emergency-shutdown systems that could have prevented or contained the October 2, 2025, explosion and fire. The refinery was operated without sufficient staffing, training, or redundancy to ensure prompt hazard identification and containment, and Defendants failed to provide timely warnings, evacuation instructions, or other protective measures for nearby residents in El Segundo, Manhattan Beach, and Redondo Beach who were foreseeably exposed to smoke, soot, and fallout.

54.    On information and belief, investigations by Cal/OSHA and the SCAQMD, along with contemporaneous media and expert reporting, confirm that Chevron's safety culture at El Segundo had long been deficient. Over the preceding decade, the facility incurred at least seventeen federal OSHA violations involving failures in hazard analysis and safe-work practices. Similar lapses led to the 2012 Chevron Richmond refinery fire, which resulted in criminal convictions and civil settlements exceeding fifteen million dollars. Despite those lessons, Chevron continued to operate aging infrastructure with inadequate corrosion control and deferred equipment replacement—conduct that courts have previously characterized as despicable and reckless in comparable refinery-fire litigation.

55.    On information and belief, Defendants' negligent acts and omissions were a substantial factor in causing the October 2, 2025, explosion and the ensuing release of toxic combustion by-products. On information and belief, the Isomax Unit 7 fire emitted a complex mixture of soot, volatile organic compounds, benzene, and polycyclic aromatic hydrocarbons that dispersed through the coastal atmosphere before settling on residential and marine properties within a ten-mile downwind corridor. Meteorological data show that while initial offshore winds carried the plume seaward,

CLASS ACTION COMPLAINT

the predictable shift to onshore sea-breeze conditions on October 3 returned airborne pollutants more than 6 miles to the south into Redondo Beach and King Harbor, producing measurable surface deposition and odor complaints. Such a sequence was foreseeable to any prudent refinery operator familiar with the region's diurnal wind patterns. Chevron's failure to anticipate and mitigate this hazard constitutes negligence per se under Evidence Code section 669, as it violated safety and environmental regulations enacted to prevent exactly this kind of off-site contamination.

56.    As a direct and proximate result of Defendants' negligence, Plaintiffs and members of the Class sustained multiple forms of harm. Their real and personal property, including homes, vehicles, and boats moored at King Harbor, were physically intruded upon by soot, ash, and oily or acidic residue, requiring professional cleaning, repainting, or replacement of corroded materials. They suffered economic losses associated with cleanup, remediation, and the temporary loss of use or rental value of their property, as well as diminution in property value due to contamination and stigma. Many experienced exposure to airborne irritants that caused respiratory distress, headaches, dizziness, and emotional anxiety, and they were deprived of the comfortable enjoyment of their homes and public spaces because of lingering odors and fear of toxic exposure.

57.    These harms were the natural and probable consequence of Defendants' breach and were neither remote nor speculative. Comparable refinery disasters—including the 2012 Chevron Richmond fire, the 2015 ExxonMobil Torrance explosion, and the 1993 General Chemical oleum release—produced nearly identical patterns of community exposure and property contamination, each traceable to operator negligence and inadequate maintenance. Given Chevron's prior violations and the refinery's close proximity to residential neighborhoods, the risk of off-site harm was not only foreseeable but inevitable absent strict adherence to safety protocols. The burden of preventing such harm through routine maintenance, corrosion inspection, and effective emergency-response training was minimal compared to the gravity of

potential injury. Defendants' conscious disregard for these duties constitutes wanton misconduct warranting punitive damages under Civil Code section 3294.

58.     As a direct and proximate result of Defendants' negligent acts and omissions, Plaintiffs and the Class have suffered bodily injury, property damage, economic loss, and emotional distress in an amount to be proven at trial. Plaintiffs seek compensatory and punitive damages, equitable abatement, medical monitoring, costs, and such further relief as the Court deems just.

## SECOND CLAIM FOR RELIEF
## STRICT LIABILITY (ABNORMALLY DANGEROUS ACTIVITY)
### [Against All Defendants]

59.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

60.     Plaintiffs assert this cause of action against all Defendants, including Chevron Corporation and all persons or entities that owned, operated, maintained, managed, or controlled the Chevron Refinery and its component units at the time of the October 2, 2025, explosion and fire. Defendants engaged in the refining, storage, and handling of large quantities of flammable, explosive, and toxic hydrocarbons— including jet fuel, hydrogen gas, sulfur compounds, and volatile organic chemicals— within a densely populated urban corridor of Los Angeles County. The process units at issue, including the Isomax hydrocracking unit, operate under extreme pressure and temperature conditions, utilizing hydrogen gas and catalytic materials that pose a substantial risk of catastrophic explosion and toxic release in the event of equipment failure or loss of containment.

61.     Under California law, an enterprise is strictly liable when it conducts an activity that is abnormally dangerous or ultrahazardous, creating a foreseeable and high degree of risk of serious harm that cannot be eliminated through the exercise of reasonable care. The refining of jet fuel through hydrogen-based hydrocracking in

proximity to residential neighborhoods, schools, and public beaches constitutes precisely such an activity. Each of the recognized factors establishing abnormal danger confirms that Chevron's refinery operations qualify as abnormally dangerous. On information and belief, the Isomax unit operated at pressures exceeding 2,000 pounds per square inch and temperatures above 700 degrees Fahrenheit, such that even a minor equipment failure could trigger an explosion and uncontrolled combustion, as occurred here. The likelihood of significant harm is evident from the resulting fireball and the plume of toxic smoke and particulates that caused widespread contamination and respiratory distress, demonstrating the severity of risk inherent in the process. The risk cannot be eliminated through the exercise of reasonable care, as even strict compliance with process-safety rules and continuous air monitoring cannot wholly prevent catastrophic release from high-pressure hydrocarbon systems. Multiple prior refinery fires in 2016, 2017, 2018, and 2022 illustrate that residual danger persists despite safety precautions.

62.    Refining petroleum is clearly not a matter of common usage or done by any other residents in the area but rather a specialized industrial operation far removed from ordinary community activities, as recognized by the California Supreme Court in *Green v. General Petroleum Corp.*, 205 Cal. 328, 333 (1928). The Chevron Refinery location is particularly inappropriate, being situated amid residential neighborhoods and coastal ecosystems within one mile of schools, marinas, and the Los Angeles International Airport—areas where an accidental release poses an extraordinary risk to human health and safety. However, fuel production provides economic utility; that benefit is outweighed by the severe, localized hazards of repeated explosions and toxic fallout affecting nearby homes and beaches.

63.    On October 2, 2025, a catastrophic failure in Isomax Unit 7 caused a massive explosion and fire that propelled a plume of soot, volatile organic compounds, and hazardous air pollutants over adjacent communities. The combustion by-products—including benzene, polycyclic aromatic hydrocarbons, sulfur oxides, and

acidic particulates—settled on homes, vehicles, and boats within the downwind impact corridor, particularly in El Segundo, Manhattan Beach, and Redondo Beach. The harm sustained by Plaintiffs, including the deposition of toxic residue, property damage, and physical discomfort, is precisely the kind of harm that renders such activity ultrahazardous and subject to strict liability.

64.     Because Defendants engaged in an abnormally dangerous activity that proximately caused off-site property damage and bodily injury, they are strictly liable for all injuries and losses resulting from the October 2, 2025, incident. Plaintiffs are not required to prove negligence or fault; it is sufficient that Defendants' refinery operations created a foreseeable and unavoidable risk of the very type of harm that in fact occurred, as established in *Luthringer v. Moore*, 31 Cal.2d 489, 496 (1948), and *Green v. General Petroleum Corp.*, 205 Cal. 328, 333 (1928).

65.     As a direct and proximate result of Defendants' abnormally dangerous activity, Plaintiffs and members of the Class suffered contamination of property from soot and oily residue requiring specialized cleaning and remediation, corrosion and deterioration of metal, glass, and painted surfaces due to acidic fallout, loss of use and diminution in value of affected homes, vessels, and businesses, and interference with their comfortable enjoyment of property. They also experienced emotional distress and anxiety arising from exposure to hazardous emissions and fear of future incidents.

66.     Plaintiffs seek judgment holding Defendants strictly liable for all damages caused by the October 2, 2025, refinery explosion and fire, including compensatory and punitive damages, costs of investigation and remediation, medical monitoring, attorneys' fees, and such other and further relief as the Court may deem just and proper.

### THIRD CLAIM FOR RELIEF
### NUISANCE
### [Against All Defendants]

67.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

68.    Plaintiffs assert this cause of action against all Defendants, including Chevron Corporation and all persons or entities that owned, operated, maintained, managed, or controlled the Chevron Refinery at the time of the explosion and fire on October 2, 2025.

69.    Under California Civil Code sections 3479 and 3480, a nuisance is anything injurious to health, indecent or offensive to the senses, or an obstruction to the free use of property that interferes with the comfortable enjoyment of life or property. A nuisance may be both public—when it affects an entire community, neighborhood, or a considerable number of persons—and private—when it causes a substantial and unreasonable interference with an individual's use and enjoyment of property.

70.    Defendants created, permitted, and maintained a condition that was injurious to health and offensive to the senses of thousands of residents throughout El Segundo, Manhattan Beach, Redondo Beach, Hawthorne, and other South Bay communities. On October 2, 2025, Chevron's Isomax Unit 7 hydrocracking system exploded and burned for hours, generating a towering fireball and dense plumes of smoke containing soot, volatile organic compounds, and hazardous air pollutants such as benzene, 1,3-butadiene, and polycyclic aromatic hydrocarbons. These combustion by-products are dispersed across residential neighborhoods, beaches, and marinas, depositing oily and acidic residues on homes, vehicles, and boats.

71.    Despite Chevron's longstanding awareness of equipment deterioration, corrosion, and repeated regulatory violations—including at least forty-six citations in the five years preceding the fire and thirteen in the preceding year—the company failed to prevent yet another catastrophic release. The resulting plume blanketed the region in noxious odors described by residents as resembling burnt rubber and compelled nearby cities to issue shelter-in-place advisories. The fallout rendered large portions of the community temporarily uninhabitable, interfered with outdoor commerce, and deprived the public of the use and enjoyment of homes, parks, and beaches.

CLASS ACTION COMPLAINT

72.     70. The nuisance affected an entire community and a considerable number of persons simultaneously, including residents, workers, and visitors across multiple municipalities. Public officials, including the mayors of El Segundo and Manhattan Beach and Congresswoman Maxine Waters, publicly acknowledged the disruption and called for Chevron to be held accountable. The incident disrupted traffic, closed marinas, and degraded regional air quality—constituting a classic public nuisance under California law,

73.     Plaintiffs and members of the Class also sustained special injuries distinct from those suffered by the public at large, entitling them to damages for private nuisance. These harms include: (a) physical invasion of property by soot, ash, and oily residue requiring professional cleaning and restoration; (b) corrosion and pitting of metal and glass surfaces caused by acidic particulates; (c) diminution in property value and interference with the quiet enjoyment and use of homes, vessels, and outdoor spaces; and (d) respiratory irritation, headaches, and emotional distress arising from exposure to fumes and fear of lingering contamination. These individualized harms exceed the general inconvenience experienced by the broader community.

74.     The nuisance remains ongoing. Residual contamination persists in affected neighborhoods, public anxiety remains high, and air-quality data remain incomplete. The risk of recurrence endures as long as Chevron operates the refinery without comprehensive safety and emission controls.

75.     As a direct and proximate result of Defendants' creation and maintenance of this nuisance, Plaintiffs and the Class have suffered and will continue to suffer property damage, economic losses, physical discomfort, and emotional distress.

76.     Plaintiffs seek:

    a.  Compensatory damages for property damage, diminution in value, cleaning and restoration expenses, loss of use and enjoyment, and emotional distress;

CLASS ACTION COMPLAINT

b. Exemplary damages under Civil Code § 3294 for Defendants' conscious disregard of public safety;

c. Equitable abatement and injunctive relief under Civil Code § 3491(1) requiring Defendants to remediate all off-site contamination, implement verified safety upgrades, fund community-based air-quality and medical-monitoring programs, and publicly disclose maintenance and safety records; and

d. Recovery of attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5, which authorizes private enforcement of important public rights.

77. Defendants' refinery operations have unreasonably interfered with the public's right to clean air, safe property, and the enjoyment of community spaces, as well as with Plaintiffs' private use and enjoyment of their own property. Plaintiffs therefore request judgment declaring that Defendants' conduct constitutes a nuisance, ordering its abatement, and awarding all damages and further relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## TRESPASS TO PROPERTY
### [Against All Defendants]

78. Plaintiffs incorporate the preceding paragraphs as though set forth herein.

79. Plaintiffs assert this cause of action against all Defendants, including Chevron Corporation and all persons or entities that owned, operated, maintained, managed, or controlled the Chevron Refinery and its component units at the time of the explosion and fire on October 2, 2025. Defendants' trespass was an unlawful interference with the possession of property and is established by proof of an intentional, knowing, or negligent entry—direct or indirect—of a physical substance onto another's property without consent. A physical invasion by particulates, smoke,

or chemical residue constitutes trespass where the matter settles upon another's property and causes measurable interference or damage.

80.     On October 2, 2025, a catastrophic explosion erupted within the Isomax hydrocracking unit of Chevron's Refinery, releasing massive volumes of smoke, soot, ash, and volatile organic compounds into the surrounding atmosphere. Expert analyses confirm that these emissions contained fine particulate matter ($PM_{2.5}$ and $PM_{10}$), polycyclic aromatic hydrocarbons, and acidic residues derived from burning petroleum hydrocarbons. As prevailing onshore winds shifted overnight, these contaminants descended upon residential and marine properties throughout El Segundo, Manhattan Beach, and Redondo Beach—including the King Harbor area—depositing an oily, dark film over buildings, vehicles, and boats.

81.     Defendants knew or, in the exercise of reasonable care, should have known that operating a high-pressure hydrocracking unit with documented maintenance deficiencies and a record of regulatory violations posed an extreme risk of explosion and the uncontrolled release of combustible materials. By continuing such operations, Defendants acted with at least reckless disregard for the foreseeable consequence that smoke, soot, and particulate matter would escape the facility and invade neighboring properties. Even if Defendants did not intend the physical intrusion, trespass liability arises when a defendant knows with substantial certainty that its conduct will result in such invasion.

82.     The particulates and residues released by the refinery physically entered and adhered to Plaintiffs' real and personal property. Laboratory and expert findings identify combustion-related soot, petroleum hydrocarbons, and acidic compounds capable of etching glass, corroding metal, staining paint, and degrading building materials and finishes. These residues also present potential health and environmental hazards when disturbed or re-aerosolized. Such tangible invasion constitutes a trespass because the contaminants occupied and altered the physical condition of Plaintiffs' land and possessions without authorization or right.

22
CLASS ACTION COMPLAINT

83.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and members of the Class suffered contamination of their homes, yards, vehicles, and vessels by soot, ash, and oily residue requiring professional cleaning and remediation; corrosion and surface damage to paint, glass, and metal finishes; economic losses including cleaning expenses, property-value diminution, and loss of use and enjoyment; and emotional distress and inconvenience arising from exposure to persistent layers of contamination and odor.

84.    The invasion constitutes a continuing trespass because the pollutants remain deposited on surfaces, in soils, and in nearby marine environments until fully abated. Plaintiffs therefore seek equitable relief requiring Defendants to remediate the contamination, monitor and remove residual pollutants, and implement adequate safeguards to prevent future intrusions.

85.    Plaintiffs seek compensatory damages for property cleaning, repair, and restoration, diminution in property value, and loss of use and enjoyment. Plaintiffs further seek punitive damages based on Defendants' conscious disregard for the rights and safety of property owners, along with injunctive and abatement relief compelling complete remediation of all affected areas. Plaintiffs also seek recovery of costs, prejudgment interest, and attorneys' fees pursuant to Code of Civil Procedure section 1021.5 for the enforcement of necessary public rights.

## FIFTH CLAIM FOR RELIEF
## NEGLIGENCE PER SE
### [Against All Defendants]

86.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

87.    Plaintiffs assert this cause of action against all Defendants, including Chevron Corporation and all persons or entities that owned, operated, managed, or controlled the Chevron Refinery and its component units at the time of the explosion

and fire on October 2, 2025. California law imposes mandatory safety and environmental standards intended to prevent precisely the type of catastrophic explosion, fire, and toxic release that occurred in this case.

88.    California Evidence Code section 669 establishes that a person is presumed to have failed to exercise due care when they violate a statute, ordinance, or regulation designed to protect a class of persons that includes the plaintiff, and that violation proximately causes the type of injury the law was intended to prevent. Health and Safety Code section 41700 prohibits any person from discharging air contaminants or other materials that cause injury, detriment, nuisance, or annoyance to a considerable number of persons, or that endanger the comfort, repose, health, or safety of the public. Similarly, South Coast Air Quality Management District (SCAQMD) Rule 402 mirrors section 41700 by forbidding the emission of air contaminants that cause injury, detriment, or nuisance to a considerable number of persons or to the public, or that cause damage to property. In addition, Title 8, California Code of Regulations section 5189, known as the Process Safety Management of Highly Hazardous Chemicals standard, requires refineries and chemical facilities to identify, evaluate, and control process hazards, maintain equipment integrity, provide employee training, and implement emergency-response procedures to prevent catastrophic releases of flammable or toxic materials.

89.    Defendants violated these statutes and regulations in multiple ways. They operated and maintained the Isomax hydrocracking unit in a deteriorated and unsafe condition, in violation of Cal/OSHA Process Safety Management requirements. They failed to correct known corrosion and furnace-tube overheating hazards before the explosion, despite recent SCAQMD citations for failing to keep equipment in proper working condition. They allowed the discharge of dense smoke, soot, volatile organic compounds, sulfur oxides, and polycyclic aromatic hydrocarbons into the atmosphere over adjacent communities, thereby creating a public nuisance and air-quality hazard in violation of Health and Safety Code section 41700 and SCAQMD Rule 402. They

CLASS ACTION COMPLAINT

further failed to ensure compliance with required refinery-emission permits and fenceline-monitoring standards mandated by SCAQMD Rule 1180.

90.    These statutes and regulations were enacted to protect the public—including residents and property owners living near refineries—from precisely the types of harm that occurred here: injury to health, damage to property, and interference with the comfortable enjoyment of life caused by air-contaminant releases and catastrophic process failures. Plaintiffs and members of the Class fall squarely within the class of persons the laws were designed to protect. The injuries they sustained—respiratory irritation, property contamination, and economic losses—are the very harms these enactments were intended to prevent.

91.    Defendants' violations of these laws give rise to a presumption of negligence under Evidence Code section 669. The October 2, 2025, explosion and ensuing smoke and fallout were the direct and foreseeable result of Defendants' failure to comply with legally mandated safety and emission controls. But for those violations, the catastrophic release and resulting contamination would not have occurred. The presumption of negligence applies because the statutes and regulations were enacted to prevent industrial explosions and off-site toxic releases; Plaintiffs are among the class of persons they were intended to protect, as neighboring residents and property owners; and the injuries suffered—respiratory distress, contaminated property, and loss of use and enjoyment—are precisely the type of harm the laws were designed to avert.

92.    Under Evidence Code section 669, the burden shifts to Defendants to demonstrate that they acted as a reasonably prudent person would have under similar circumstances. Given Chevron's documented history of regulatory violations, repeated fires, and the obvious foreseeability of such an incident, Defendants cannot meet that burden.

93.    Defendants' statutory and regulatory violations were substantial factors in causing the injuries alleged. Plaintiffs and Class members suffered physical contamination of property by soot, ash, and chemical residue; respiratory and sensory

CLASS ACTION COMPLAINT

irritation from exposure to toxic emissions; economic losses from cleaning, repair, and diminished property value; and loss of use and enjoyment of property and community spaces.

94.    Plaintiffs therefore seek judgment against all Defendants for compensatory damages according to proof; punitive damages for willful disregard of mandatory safety standards; injunctive and abatement relief compelling full compliance with Cal/OSHA section 5189, SCAQMD Rule 402, and all related air-quality and safety regulations; attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5; and such other and further relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
## EQUITABLE RELIEF — MEDICAL MONITORING

(Against All Defendants)

95.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

96.    The refinery explosion and fire at Chevron's El Segundo facility on October 2, 2025, released a complex mixture of toxic and carcinogenic substances—including benzene, 1,3-butadiene, formaldehyde, acrolein, and polycyclic aromatic hydrocarbons—into surrounding residential and commercial areas. Exposure to these compounds, even at intermittent or subacute levels, is scientifically recognized as posing significant health risks, including chronic respiratory illness, hematologic malignancies, and other latent diseases. Under California law, individuals exposed to toxic substances due to another's negligence may recover the costs of reasonable medical monitoring either as an equitable remedy or as an element of compensatory damages, as established in *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1006–09 (1993).

97.    Plaintiffs and members of the Class were involuntarily exposed to airborne contaminants known to cause delayed or cumulative injury to the lungs, blood, and other organ systems. Expert toxicological evidence demonstrates that the refinery's plume contained recognized carcinogens and respiratory irritants such as benzene, 1,3-butadiene, and polycyclic aromatic hydrocarbons, all capable of inducing inflammation, DNA damage, and genetic mutations with repeated or sustained exposure. Residents and workers within the downwind impact corridor—extending roughly zero to ten miles south-southeast of the refinery and encompassing King Harbor and Redondo Beach—experienced inhalation and dermal exposure consistent with pathways documented in comparable refinery-fire incidents, including those in *Potter* and *Anderson v. PG&E*, 199 Cal.App.3d 676 (1988). Epidemiological data and public-health guidance from the California Environmental Protection Agency and the Agency for Toxic Substances and Disease Registry confirm that early detection through periodic screening substantially improves outcomes for chemically induced pulmonary and hematologic disorders.

98.    Periodic diagnostic testing, including complete blood counts, pulmonary function tests, urinalysis for benzene metabolites, and biomarker screening for polycyclic aromatic hydrocarbon adducts, can detect subclinical or pre-symptomatic effects before the onset of overt disease. The costs of such testing are modest compared to the severity of potential illnesses and the effectiveness of early medical intervention. Plaintiffs and Class members currently lack access to a coordinated, community-based health surveillance framework and cannot feasibly obtain individualized monitoring without a Court-supervised structure and funding.

99.    Plaintiffs therefore seek equitable relief in the form of a Court-supervised medical monitoring program to be funded entirely by Defendants. The program should include eligibility criteria based on residence or employment within the downwind impact corridor during and immediately following the incident; standardized testing protocols for baseline and periodic examinations tailored to the contaminants identified

in Defendants' emissions; a monitoring duration sufficient to capture latent disease development, not less than ten years or as recommended by qualified experts; administration by an independent medical and scientific panel approved by the Court; and data collection and reporting to public-health authorities to facilitate community-wide risk assessment and disease prevention.

100.    In the alternative, Plaintiffs seek to recover the reasonable costs of medical monitoring as an element of damages within their negligence and nuisance claims to ensure ongoing health surveillance and early detection for all individuals exposed to Defendants' emissions.

101.    Accordingly, Plaintiffs request that the Court enter an order establishing and supervising the medical monitoring program described herein; appoint an independent administrator and medical advisory board; require Defendants to fund all program costs, including testing, administration, community outreach, and data analysis; award attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5, which permits private enforcement of necessary public-health rights; and grant such further equitable or declaratory relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF
## RESTITUTION / UNJUST ENRICHMENT (EQUITABLE)

(Against All Defendants)

102.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

103.    This cause of action is brought in equity to prevent Defendants from retaining the benefits and cost savings obtained through their wrongful and unlawful conduct. California law provides that a party who has been unjustly enriched at the expense of others must make restitution to restore the value of those ill-gotten gains. Courts may order restitution or disgorgement even in the absence of a contract or direct

transaction when equity and good conscience require restoration to prevent a wrongdoer from profiting from its own misconduct.

104.    Defendants, through the operation of the Chevron El Segundo Refinery, derived substantial economic benefit by deferring necessary maintenance, inspections, and equipment replacement despite known corrosion and safety hazards, thereby reducing operating costs and avoiding capital expenditures. They ignored repeated Cal/OSHA and South Coast Air Quality Management District (SCAQMD) citations—forty-six violations in the five years preceding the fire, including thirteen within the year immediately prior—and avoided the costs associated with compliance, safety upgrades, and temporary shutdowns. Defendants continued production at high throughput levels despite compromised safety margins, thereby maximizing profits while significantly increasing the risk of catastrophic failure. In doing so, they externalized the inevitable cleanup, decontamination, health, and environmental costs onto the surrounding community, local governments, and Plaintiffs.

105.    Defendants' financial enrichment is directly linked to their wrongful conduct. By cutting costs on maintenance and disregarding mandatory safety obligations, they avoided expenditures that would have been necessary to prevent the explosion, emissions, and widespread contamination described herein. Those deferred costs have now been shifted onto the affected communities, which bear the burden of cleaning soot and oily residue, repairing damaged property, monitoring air quality, and addressing resulting health concerns. Permitting Defendants to retain these ill-gotten gains would effectively reward unlawful behavior and contravene established equitable principles holding that no one should profit from their own wrong. *County of San Bernardino v. Walsh*, 158 Cal.App.4th 533, 542 (2007).

106.    Equity, therefore, requires that Defendants disgorge and restore the monetary value of the benefits unjustly retained. These benefits include cost savings from deferred maintenance, noncompliance with safety and environmental standards, and the avoidance of required upgrades; the excess profits realized during unsafe

operations; and the monetary value of losses and expenses that Defendants shifted to the community, including the costs of property decontamination, medical monitoring, and environmental remediation. Restitution may be awarded directly to Plaintiffs and the Class or directed into a court-supervised constructive trust or equitable fund dedicated to environmental cleanup, community health programs, and enhanced safety oversight of the refinery's operations.

107.    Plaintiffs seek restitution and disgorgement of all benefits wrongfully obtained by Defendants as a result of their unlawful, negligent, and reckless conduct; the creation of a constructive trust or equitable restitution fund to restore those benefits for the remediation and monitoring of affected communities; pre- and post-judgment interest as allowed by law; attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5 for the enforcement of critical public rights; and such other and further equitable relief as the Court deems just and proper.

## **PRAYER**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray for judgment against all Defendants, jointly and severally, on every cause of action alleged herein, and request that the Court grant the following relief:

A.   Certification of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), and where appropriate Rule 23(b)(2); appointment of Plaintiff as Class Representative; and appointment of undersigned counsel as Class Counsel.

B.   An award of compensatory damages in an amount to be proven at trial, including but not limited to compensation for personal injury and emotional distress; property damage, contamination, corrosion, and staining; diminution in property value; cleaning, remediation, and restoration costs; loss of use and

enjoyment of property; and economic losses suffered by residents, businesses, and property owners within the affected area.

C.  Establishment and funding of a Court-supervised medical monitoring and diagnostic program for Class members exposed to toxic substances released by Defendants, including eligibility criteria, testing protocols, and long-term surveillance consistent with the requirements described herein.

D.  Entry of injunctive and equitable relief requiring Defendants to abate and remediate contamination of residential, commercial, and marine properties; undertake verified safety upgrades, maintenance, and emissions-control improvements; comply fully with Cal/OSHA Process Safety Management standards (8 C.C.R. § 5189), SCAQMD Rule 402, and all related safety and environmental regulations; implement enhanced fenceline and community air monitoring systems providing data transparency and real-time public notification; and fund ongoing environmental testing and cleanup efforts under independent oversight.

E.  Punitive and Exemplary Damages. An award of punitive and exemplary damages pursuant to Civil Code section 3294 and applicable federal law for Defendants' willful, malicious, and conscious disregard of the health and safety of the surrounding community.

F.  Restitution and Disgorgement. Restitution and disgorgement of all benefits and unjust enrichment obtained through Defendants' unlawful, negligent, or inequitable conduct, including the creation of a Court-supervised fund dedicated to community remediation, environmental restoration, and public health programs.

G.  Attorneys' Fees, Costs, and Interest. An award of reasonable attorneys' fees, litigation expenses, and costs of suit, including under Code of Civil Procedure section 1021.5 (private attorney general doctrine), together with pre- and post-judgment interest as permitted by law.

CLASS ACTION COMPLAINT

H.  Such other and further legal or equitable relief as the Court may deem just, proper, and necessary to ensure complete justice to Plaintiffs, the Class, and the affected communities.

## **DEMAND FOR JURY TRIAL**

108.  Plaintiff demands trial by jury on all issues so triable. Fed. R. Civ. P. 38(b); C.D. Cal. L.R. 38(3).


Respectfully submitted,

Dated:  October 9, 2025                    TRUJILLO & WINNICK, LLP


                                                        /s/ Anthony W. Trujillo
                                            By: _____
                                                    Anthony W. Trujillo
                                                    Attorneys for Plaintiff Daniel Coffey
                                                    and the Putative Class